# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  1:20 MJ 297 |
| | ) | |
| 4522 Piedmont Trace Drive High Point, North Carolina 27409 | ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment C.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☐ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Section 848 | Continuing Criminal Enterprise |
| 21 U.S.C. Sections 846/841 | Narcotics Conspiracy and Poss. with Intent to Distribute |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/S/ JUSTIN S. TERRY
*Applicant's signature*

JUSTIN S. TERRY, SPECIAL AGENT, FBI
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: 10/19/2020

_____
*Judge's signature*

City and state: WINSTON-SALEM, N.C.

THE HON. JOI ELIZABETH PEAKE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF

## AN APPLICATION FOR A SEARCH WARRANT

I, Justin Terry, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1. I am investigating offenses related to drug trafficking. This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises located at 4522 Piedmont Trace Drive, High Point, North Carolina (the "SUBJECT PREMISES"), more specifically described in Attachment A, and the person of Landis JACKSON (the "SUBJECT PERSON"), as more specifically described in Attachment B, for fruits of violations of Title 21 U.S.C § 848; Title 21 U.S.C § 848(e)(1)(a); and Title 21 U.S.C. § 846, 841(b)(1)(A) and 841(b)(1)(D), which items are more specifically described in Attachment C.

2. The statements in this affidavit are based in part on information provided by other law enforcement officers and on my investigation of this matter. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 21 U.S.C § 848; Title 21 U.S.C § 848(e)(1)(a); and Title 21 U.S.C. § 846, 841(b)(1)(A) and 841(b)(1)(D), are presently located at the SUBJECT PREMISES and/or on the SUBJECT PERSON.

### AFFIANT BACKGROUND

3. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I have been a Special Agent with the FBI since June

2017, and I am currently assigned to the Tidewater Violent Crime Task Force at the FBI Norfolk Field Office. Prior to becoming a Special Agent, I was employed as a Police Officer and Detective at the Charlotte-Mecklenburg Police Department for approximately 7 years. During my time with the Charlotte-Mecklenburg Police Department, my assignments included working in a uniformed patrol capacity, as an investigator in the Armed Robbery Unit, and as a Task Force Officer with the FBI Safe Streets Task Force.

4. Over the course of my law enforcement career, I have been the principal investigator in state and federal investigations involving violent gangs, narcotics trafficking organizations, violent incident crimes, bank robbery, and violations of the Hobbs Act. Through experience and training, I have become familiar with the methods and schemes employed by criminals to obtain and distribute controlled substances. I am familiar with, and have utilized, a wide variety of investigative techniques, including but not limited to the development of cooperating sources, physical surveillance, controlled purchases, telephone toll record analysis, pen registers, issuing grand jury subpoenas, search warrants and electronic surveillance. As a result of my training and experience as a Special Agent for the FBI, I am familiar with Federal laws and statutes. The facts in this Affidavit come from my personal observations, my training and experience, my review of documents, and information obtained from other agents and witnesses.

5. On September 25, 2020, a federal grand jury indicted JACKSON for criminal violations including, Title 21 U.S.C § 848, Continuing Criminal Enterprise; Title 21 U.S.C § 848(e)(1)(a), Continuing Criminal Enterprise – Murder; and Title 21 U.S.C. § 846, 841(b)(1)(A) and 841(b)(1)(D), Conspiracy to Distribute and Possess with Intent to Distribute Cocaine and Marijuana, among other crimes. There is also probable cause to search the premises and person

2

described in Attachment A and Attachment B for evidence, instrumentalities, or fruits of these crimes as further described in Attachment C.

## **BACKGROUND**

6.  The Federal Bureau of Investigation (FBI) is conducting a multistate investigation into a murder for hire that occurred on April 19, 2016 in Norfolk, Virginia. The investigation has shown that a member of the Nine Trey Gangstas (NTG) Bloods gang set out of North Carolina, identified as Kalub Shipman (Shipman), was paid $10,000 to commit this murder. The murder was ordered by Jaquate Simpson (Simpson), a drug trafficker operating out of the Greensboro, North Carolina area. Simpson ordered the murder of an individual living at a residence in Norfolk, Virginia, because Simpson's narcotics customer, Brandon Williams, had stolen a shipment of narcotics. Simpson solicited the help of his close associate, Landis JACKSON, a.k.a. "Juve" (JACKSON), to find people to carry out this murder. JACKSON subsequently hired Shipman to commit the murder in retaliation for the cocaine theft committed by Brandon Williams. Shipman was contracted to kill anyone that came outside the door at 824 Trice Terrace, which resulted not in the murder of Brandon Williams, but instead his 59 year old aunt, Lillian Bond. Bond was a 20-year employee of a local children's hospital and was known as a pillar of her community. Following the Bond murder, Simpson continued to lead his narcotics trafficking organization, with JACKSON serving as one of Simpson's enforcers and closest associates. Simpson was the target of a North Carolina State Bureau of Investigation (NCSBI) led investigation, which culminated in his arrest on December 15, 2017. Information collected since Simpson's arrest indicates JACKSON continues to be engaged in narcotics trafficking activity.

3

## **PROBABLE CAUSE**

7. On April 19, 2016, at approximately 11:40 a.m., Norfolk Police Department (NPD) officers responded to 824 Trice Terrace in Norfolk, where a woman, Lillian Bond, was suffering from multiple gunshot wounds. She died soon after. A witness who saw the shooting stated that he saw an older model black and grey Lexus LS 400 drive up to the victim while she was taking the trash out. The witness stated that the passenger got out of the vehicle and started shooting the victim. According to this witness, the vehicle had a North Carolina license plate. Initial information received by NPD indicated that the homicide was a retaliation killing carried out because the victim's nephew, Brandon Williams, had robbed a drug dealer in North Carolina. Williams was known to be associated with the residence where the homicide occurred.

8. On May 23, 2017, NTG member Alvaughn Davis (Davis) pled guilty to a separate federal RICO murder charge and agreed to cooperate with the government. Davis was later sentenced to 45 years in prison. Following his plea, Davis provided a statement to investigators regarding his knowledge of Bond's murder. According to Davis, a few days before April 18, 2016, Shipman and another high ranking NTG member, identified as James Murphy, a.k.a. "Teflon" (Murphy), showed up at Davis's residence in Portsmouth, Virginia. Shipman told Davis that he was in town to conduct a "hit" for someone who had stolen narcotics from an unknown supplier. According to Shipman, the residence for the individual who robbed the supplier was located in Norfolk, Virginia. Later the same day, Shipman, Murphy, and Davis drove to Norfolk to scout out the residence and conduct surveillance. While they were together, Davis learned the "hit" was for $10,000 and Shipman had also agreed to do two other hits in Greensboro, North Carolina. Shipman was going to be paid $10,000 for each hit. Shipman, Murphy, and Davis went to Newport News, where Davis retrieved a handgun, before travelling back to 824 Trice Terrace in Norfolk. Davis, the lowest-ranking gang member in the car, approached the victim's

4

residence but decided he did not want to be involved and returned to the car without knocking on the door. Shipman and Murphy subsequently left the area and went back to North Carolina. Davis statements, concerning the timeline of events that precipitated Shipman's first trip to the Norfolk area, were also consistent with statements made by James Murphy. Murphy admitted to accompanying Shipman on the first trip. Murphy also advised that Shipman attempted to conduct surveillance on a separate murder-for-hire contract location during he and Shipman's initial trip back from Virginia to North Carolina.

9. On April 18, 2016, Shipman and his cousin, Nelson Evans (Evans), traveled to Portsmouth in a Lexus with a North Carolina license plate. The Lexus belonged to Evans's girlfriend, and they spent the night at Davis's residence. While at Davis's residence, Shipman showed Davis a semiautomatic .357 pistol, the same caliber pistol used in the Bond homicide. According to Davis, Shipman and Evans discussed how they planned to execute the murder. Specifically, Shipman was going to be the driver and Evans was supposed to be the shooter. Shipman and Evans subsequently left Davis's residence the next morning, committed the murder of Lillian Bond, and fled back to North Carolina. Davis later received a call from Shipman asking if everything was ok, at which time Davis advised Shipman that he had heard about the homicide on the news. The statements made by Davis concerning the chain of events leading up to the homicide were later corroborated by tunnel license plate captures, surveillance footage, social media data, and cell tower analysis conducted on the telephones utilized by Davis, Shipman, Murphy, and Evans.

10. Further information was obtained from another cooperating source, hereinafter referred to as CW-1, identifying the drug supplier who ordered the "hit" against Williams' aunt. According to CW-1, Jaquate Simpson was a multi-kilogram cocaine and heroin dealer who

5

operated out of the Greensboro, North Carolina area. Simpson utilized a female, identified as Patrice Farland (Farland), to transport kilograms of narcotics to his customer in the Tidewater area of Virginia (Williams). Simpson was dealing with this Virginia customer from approximately 2012 to 2016. CW-1 stated on one occasion, Farland delivered two "bricks" to the Virginia customer. She was there with him and waited for him to give her the money for the drugs, but he took off and did not pay her. CW-1 overheard Farland calling Simpson and explaining what had happened. Farland was very scared and pleaded with Simpson to not hurt her because she had kids. Simpson instructed Farland to come back to North Carolina and meet with him in person. After Simpson heard the drugs had been stolen, CW-1 heard Simpson discussing what he should do with his associate, JACKSON. JACKSON wanted Simpson to kill both Farland and the Virginia customer. According to CW-1, Simpson cared about Farland and decided not to kill her. Simpson subsequently made Farland show him where the Virginia customer was staying.

11. The photograph below captured Farland (shown on right) and Williams (shown in middle) at the wedding of Lillian Bond's daughter, which took place approximately one month before the murder:

6



12. The photograph below captured Lillian Bond at her daughter's wedding:



13. According to CW-1, approximately a week after the drugs were stolen, a lady was killed outside the Virginia customer's residence. CW-1 heard that the victim was not the guy's mother, but she had helped raise him. CW-1 heard that she may have been the guy's aunt or grandmother. After the murder took place, CW-1 heard Simpson say, "His grandma had to feel it!" Simpson bragged that, "they caught the lady taking the trash out" and she was killed in broad daylight, which matched the manner of the Lillian Bond homicide. Sometime after the murder, Simpson learned that the guys involved had been arrested. According to CW-1, Simpson was concerned that these guys were going to talk and he would get arrested. CW-1 overheard Simpson talking with JACKSON and asking JACKSON if he had gotten "solid" people to do this. Criminal history records show that Shipman was arrested for drug related offenses on June 20, 2016, approximately two months after the Bond homicide. Shipman's cellular telephone was seized during his arrest and a search warrant was issued for the phone.

8

14. A review of Shipman's telephone showed that Shipman had exchanged a series of text messages with telephone number 773-554-0231. On June 16, 2016, Shipman's phone received a text message from telephone number 773-554-0231, which stated, "https://youtu.be/8hw9EVcL_go This the link to the official video bro." This link referenced a YouTube video titled, "JUJU CAPONE X BANDMAN KEVO – REAL NIGGA" . On June 20, 2016, the night of Shipman's arrest, one of Shipman's phone's last communications is a text message to a contact identified as "Ruger" that stated, "773-554-0231 text this number tell him yu my bro n tell him my bond." In a separate text message on the same night to a contact identified as "AK", Shipman's phone sent a text message that stated, "Tell him im loxk up ask if he can help 7735540231 tell him I got the boot". Law enforcement showed CW-1 the video titled "JUJU CAPONE X BANDMAN KEVO – REAL NIGGA" and CW-1 recognized JACKSON as the one rapping in the video. These records show that some of the last contacts made by Shipman prior to his arrest booking was to make attempts to contact JACKSON through intermediaries and solicit JACKSON'S help with possible bail. CW-1 provided the title of JACKSON's Instagram account as "ItsJuvyBaby!" Law enforcement obtained toll records for telephone number 773-554-0231 and the records showed the phone became active on April 20, 2016, the day after the Bond homicide. The records also showed the subscriber's address was 1912 Cedar Fork Drive, Greensboro, North Carolina, which was a known address for JACKSON.

15. On May 14, 2016, less than a month after the Bond homicide, Shipman's phone exchanged a series of text messages with telephone number 773-554-0231. The first message from Shipman's phone stated, "If you give me Two more eggs ill scramble the situation for breakfast." Telephone number 773-554-0231 responded with a text to Shipman's phone that

9

stated, "It ain't my situation to make a final decision. But I'm about to look into it now." Telephone number 773-554-0231 then sent another message that stated, "Ima talk to you in person". Shipman's phone responded with a text message that stated, "Let me no when you trying to link up I have zero tolerance for bad apples." Law enforcement believes that Shipman's reference to "two more eggs" refers to two of the three murders he had been contracted to execute. At the time of this message, Shipman had already fulfilled the original murder contract, offered by Simpson and JACKSON, by killing Lillian Bond. Telephone number 773-554-0231, which is associated with JACKSON, responds that it is not his situation to make a final decision. These messages are consistent with the information received from CW-1, indicating Simpson had gotten JACKSON to find the people to carry out the Bond murder.

<u>Evidence Collected as Part of the SBI Investigation</u>

16. In the summer of 2017, NCSBI initiated a narcotics investigation targeting Simpson and several co-conspirators, to include JACKSON. The investigation culminated in the arrest of Simpson on December 15, 2017. During the investigation, there were several recorded telephone conversations between Simpson and JACKSON, during which they discussed narcotics trafficking, specifically cocaine. For example, on December 2, 2017, JACKSON utilized his cellular telephone to call Simpson and ask Simpson to send JACKSON "the other one" (kilogram of cocaine). JACKSON told Simpson they had already worked out a deal for "135" ($135,000) for "4 of them" (4 kilograms of cocaine). JACKSON then told Simpson he had "119" ($119,000) now and would have the other "16" ($16,000) soon. There were additional recorded phone calls by Simpson arranging for the transportation of the 4 kilograms of cocaine to JACKSON's address. NCSBI surveillance units observed Simpson placing the bag containing the 4 kilograms of cocaine into a vehicle. They then observed the vehicle travel to an address

10

associated with JACKSON. Several search warrants were executed by state and local law enforcement at the time of Simpson's arrest. Items seized included multiple kilograms of cocaine, a kilogram of fentanyl, approximately 50 pounds of marijuana, approximately $171,000 of U.S. currency, and several pieces of jewelry valued at over $420,000. Several members of Simpson's Drug Trafficking Organization (DTO) were arrested along with Simpson, but JACKSON was not.

17. Analysis of the SBI wire indicated that JACKSON and Simpson spoke with each other almost daily and discussed narcotics trafficking. These conversations occurred at times ranging from early in the morning to late at night. In one conversation, JACKSON estimated that his part of the narcotics trafficking organization was earning approximately $4,000 per day. JACKSON spoke openly about the network of people that he employed to sell drugs for him, and referred to them as his "wave." On multiple occasions, JACKSON talked about one of his drug distributors in particular that went by the name "Gucci." None of the individuals working for JACKSON were arrested during the SBI takedown of the Simpson organization.

18. Intercepted conversations showed JACKSON was willing to commit violence to protect his part of the drug trafficking operation. In a call on September 24, 2017, JACKSON relayed to Simpson how one of his employees had been robbed the previous night. While discussing how to respond to a situation like this, JACKSON stated, "That's my motto. I'm whackin' somebody. I'm on that for life, I don't give a fuck how much money I get, I'm doin' it. I ain't payin'. I'm whackin' your ass. I got to get the ache out my heart . . . ."

19. During the time of the SBI wire, JACKSON was surveilled from time to time and was never seen going to a legitimate job. The FBI later would conduct a database check for

11

JACKSON'S employment status in the state of North Carolina and never found any legitimate sources of income.

20. During another intercepted call from the SBI wire on December 3, 2017, JACKSON was asking Simpson to come pick up money and mentioned that he had been pulled over by police the prior evening. While recounting his interaction with the police, JACKSON stated he had not talked to police since he and "Kato" (Shipman) were pulled over in the Overland Heights neighborhood. A police report obtained by law enforcement showed JACKSON and Shipman were pulled over by police on March 26, 2016, approximately three weeks before the Bond murder.

21. On December 10, 2017, JACKSON had a phone conversation with Simpson that was intercepted on the wiretap of Simpson's phone. During this call, JACKSON and Jaquate Simpson discussed using drug proceeds to purchase luxury cars and JACKSON indicated he wanted a "Hellcat," which is known to the affiant as being a particular type of Dodge Challenger. During the call, Simpson explained to JACKSON how to obtain cars in a manner that it will "look clean," and mentioned putting the vehicles in a nominee name.

22. On December 14, 2017, JACKSON had another intercepted telephone conversation with Simpson. During this particular call, JACKSON stated that he was attempting to apply for a credit card, but that the credit card company needed employment verification. JACKSON asked Simpson if he could list one of Simpson's front companies as his employer, and Simpson agreed. Simpson and JACKSON then discussed how much they should say JACKSON was earning through employment at Simpson's company, finally agreeing on $50,000 a year.

23. On December 15, 2017, Simpson was arrested along with multiple associates involved in trafficking narcotics. As part of the NC SBI arrest operation on Simpson's

12

Case 1:20-mj-00297-JEP   Document 1   Filed 10/19/20   Page 13 of 33

organization, search warrants were executed at multiple residences associated with Simpson and his co-conspirators. During the course of the searches, investigators located a significant amount of drug evidence, including multiple kilograms of cocaine, a kilogram of fentanyl, and approximately 50 pounds of marijuana. At one of the locations searched, 214 Casper Lane in Lexington, North Carolina, investigators found no drug evidence but instead found substantial proceeds that Simpson had obtained as the result of operating his drug enterprise. Items of value located at 214 Casper Lane included multiple items of jewelry worth hundreds of thousands of dollars, almost $70,000 in United States currency, and luxury vehicles to include a Rolls Royce Wraith and Chevrolet Corvette.

<u>Evidence Collected After the Arrest of Simpson</u>

24. On March 26, 2018, officers from the Greensboro Police Department Tactical Narcotics Unit were conducting surveillance at 607 Williard Street, Greensboro, North Carolina. This location was believed to be involved in the sale of crack cocaine, heroin, and pills by an individual named Eric Oliver, a.k.a "Gucci." While conducting surveillance, officers observed a black Lexus pull into the driveway. A male was observed exiting 607 Willard Street and approaching the passenger side of the Lexus bearing North Carolina license plate FDD-4608. After approximately 1 minute, the male went back inside of 607 Willard Street and the Lexus left the residence. Noting that the "short stay" at the residence was consistent with a narcotics transaction, officers followed the vehicle and initiated a traffic stop of the Lexus after it was observed crossing into another lane. JACKSON was identified as the driver of the Lexus. During the traffic stop, officers noted that JACKSON was breathing rapidly, and JACKSON'S chest could be seen rising and falling through his jacket. Officers observed two large stacks of money wrapped in rubber bands in plain view inside the car. When asked how much currency

13

this was, JACKSON replied "5 bands," which in common parlance means approximately $5,000

A drug sniffing dog responded to the scene and received a positive "hit" on the vehicle, but no

narcotics were located and JACKSON was subsequently released.

25. Public record searches of JACKSON'S Instagram Account ("itsjuvybaby") yielded

the following evidence -



This picture of JACKSON holding a large amount of $100 bills was posted in December

of 2019, two years after the Simpson's arrest. The drug investigation of Simpson and

JACKSON showed that they regularly sold multiple kilogram weights of cocaine and

marijuana and generated millions of dollars in revenue from 2012 to 2017, when Simpson

was arrested by state authorities.



The second picture, also posted in December of 2019, is a piece of jewelry, a customized pendent. Search warrants of Simpson's residences yielded almost half a million dollars of jewelry. Recorded phone calls between Simpson and JACKSON showed they regularly paid thousands of dollars for watches, jewelry, and cars.



The third picture, also posted in December 2019, is the back of that same piece of jewelry with the inscription "FREEQUAY". Recorded phone calls show that "Quay" is one of Simpson's nicknames and at the time of the posting Simpson was awaiting trial on state charges in North Carolina. It appears JACKSON commissioned this piece as a statement about Simpson's pending state charges.



The fourth posting is a picture of JACKSON (left), an unidentified male (center), and Simpson (right). JACKSON appears to be holding a large amount of currency, while Simpson is wearing a Carolina Panthers jewelry pendant.



The fifth picture, posted by JACKSON on August 4, 2018, shows him posing with several unknown men in Mexico. Interviews with government cooperators, plane tickets, and intercepted conversations all corroborate that the main supplier of cocaine to Simpson and JACKSON was from Mexico. Additionally, JACKSON used three electrical "plug" emojis on his caption of the photo. An emoji is a small image used in electronic communication that can take the form of a small face, animal, or everyday object. From my experience investigating drug-related offenses, I am aware that the term "plug" is a slang term often used to refer to a drug suspect's source of supply. The timing of this posting is important, because it occurred nearly eight months after Simpson's arrest, and shows JACKSON, by his own (emoji) admission, continuing to interact with Mexican narcotics suppliers.

26. On June 26, 2020, the FBI obtained a search warrant for JACKSON's Instagram account. Results from the search warrant showed that JACKSON continued to be involved in the drug trade and collected substantial proceeds from this activity. For example, on July 16,

18

2018, JACKSON posted the following message to another Instagram user identified as "bce_d_lee": "Jay was getting down together when I first got out the joint. We met you and your people in Virginia at first but we from North Carolina if you can recall. I don't know what it's gonna take to touch bases with you but Jay going thru his own thing but pointed me in your direction. I'm reaching out with all sincerity so if it ain't no inconvenience FaceTime me at 312 4014979. Peace." Publicly available information on the Instagram page of "bce_d_lee" indicated that the user was located in Houston, Texas. This text message took place approximately one month before JACKSON posted the picture of himself in Mexico with his "plug." According to Brandon Williams, whose aunt's (Lillian Bond's) murder was ordered by Simpson, Simpson and JACKSON had traveled together to the Tidewater area to meet with Williams and negotiate narcotics transactions. On one occasion, Williams recalled Simpson being the middleman for a deal involving one kilogram of heroin being sold by unknown individuals from Houston, Texas, to one of Williams' associates in Norfolk, Virginia. The above message from JACKSON was sent approximately 7 months after Simpson's arrest and it appears to be an attempt by JACKSON to reach out to Simpson's narcotics supplier.

27. On May 15, 2020, JACKSON received a post from an Instagram account identified as "fridayfontana." The post stated, "Bro need 7500 for Marc Cummings". Cummings is an attorney who practices law in North Carolina. At the time of this post, recorded jail calls and other information indicated Simpson was having issues with his attorney and trying to get a new one. JACKSON'S account responded by posting, "I gave him 30 thousand already. Ask him what happened to that." The investigation to this point has not revealed any legitimate sources of income for JACKSON, and in fact no wage history exists for JACKSON in North Carolina. It appears JACKSON is utilizing illicit narcotics proceeds to help finance Simpson's legal defense.

19

Previously, CW-1 told law enforcement in 2012 JACKSON murdered Jamal Perry for Simpson. During this time period, CW-1 overheard JACKSON calling Simpson from jail and asking Simpson to pay $15,000 of his $30,000 legal fees.

28. On June 8, 2020, "friday fontana" sent the following picture to JACKSON's Instagram account:



JACKSON responded with the following message: "That's about the size of my piece…ask him what the total dimensions will be. Mine is 3.5 inches across and 3 in vertical. 18.5 is fair. I paid 20k for my piece minus the chain but I got 360 grams of gold and a little less than 25 carats vs g-h diamonds". This post indicates JACKSON paid $20,000 for a piece of jewelry despite having no legitimate sources of income.

29. On June 13, 2020, JACKSON's Instagram account sent a message to another user identified as "eboni_faith". The message stated, "If you had a 670 or are able to find some with

one I had a lick for 5K for you." A "lick" is a known slang term for a robbery. This message indicates JACKSON had identified a robbery target valued at $5,000. The data received in response to the Instagram warrant ended on June 26, 2020.

30. Since prospective location monitoring on JACKSON'S cellular phone was authorized in September 2020, the FBI has identified at least one residence JACKSON utilizes on a regular basis. Surveillance was initiated at this residence periodically on September 28, September 29, and September 30, 2020. The following photos were taken during surveillance activity on September 30, 2020.

31. This first photo is of the attached garage at 4522 Piedmont Trace Drive in High Point, North Carolina. Agents observed Jackson arrive at the residence and open the garage door. Agents identified the car pictured inside as a Dodge Challenger, bearing North Carolina license plate HEL-7881.



21

32. Data collected from the first search warrant was analyzed in real time by federal agents during the period of surveillance. Just prior to arriving at 4522 Piedmont Trace Drive on September 30, 2020, JACKSON'S phone showed tower activity at different locations on the east side of Greensboro for short periods of time. Investigative information obtained from the 2017 NCSBI case and the traffic stop of JACKSON in 2018 by the Greensboro Police Department indicated that JACKSON was involved in selling narcotics to one or more individuals in this area of Greensboro. During the pendency of the wiretap in 2017, JACKSON regularly spoke with Jaquate Simpson about picking up money from drug distribution points, collecting it into larger amounts, and then remitting it to Simpson for payment of kilograms of cocaine Simpson gave to JACKSON. The following photo is of JACKSON entering the residence carrying a plastic bag.



33. Open source information obtained by the FBI indicates that the SUBJECT PREMISES was listed for rent on September 3, 2019. The listing was removed on September

27, 2019, and the SUBJECT PREMISES was associated with Oza Jackson, JACKSON'S father, and Andre Jackson, JACKSON'S brother, in October 2019. In this affiant's training and experience, individuals involved in the drug trade often avoid using their true name to purchase or rent property, instead utilizing friends and family to act as nominees in an attempt to conceal their whereabouts and assets. Information resulting from physical surveillance and location monitoring of JACKSON'S cellular phone indicates that JACKSON currently resides at the SUBJECT PREMISES. During the course of physical surveillance conducted by investigators at the SUBJECT PREMISES, no individuals have been observed at the residence except for JACKSON.

34. On or about December 15, 2017, state investigators in North Carolina executed a search warrant at 1912 Cedar Fork Drive, Greensboro, North Carolina. This was an address where JACKSON had been observed conducting multiple narcotics transactions with Simpson's co-conspirators. JACKSON was not located at the residence at the time of the search warrant, and minimal evidence was located at the residence. However, later review of JACKSON'S Instagram direct messages in the days following the search warrant execution at 1912 Cedar Fork Drive revealed that JACKSON maintained an apartment separate from the residence on Cedar Fork Drive that was never identified by investigators. JACKSON, apparently fearing apprehension by law enforcement, sent multiple messages to an intermediary who was instructed by JACKSON to go to this apartment and retrieve personal items belonging to JACKSON.

35. In the training and experience of the affiant, individuals involved in the trafficking and sale of narcotics often store the proceeds of their illegal activity at a premises that is separate from the location where narcotics are stored. This allows for the subject to maintain direct supervision and control of the criminally-obtained assets, with minimal risk of being discovered

by law enforcement. This is consistent with the results of the search warrant conducted on Simpson's Casper Lane residence in 2017, where substantial assets in the form of cash, jewelry, and luxury vehicles were recovered, but no narcotics were present at this location.

## CONCLUSION

36. The FBI has obtained an indictment for Simpson, JACKSON, and several other members of their narcotics trafficking organization. The crimes being committed by JACKSON are listed in paragraph five of this affidavit and include several capital eligible offenses. Based on the information gathered from multiple sources, including JACKSON's Instagram account, there is probable cause that JACKSON continues to be involved in narcotics trafficking. It is further believed that proceeds from the narcotics trafficking activity described above likely constitute the bulk of Jackson's monetary income.

37. Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the fruits of these offenses, more fully described in Attachment C, are located at the SUBJECT PREMISES, more fully described in Attachment A, and/or on the SUBJECT PERSON, more fully described in Attachment B. I, therefore, respectfully request that the attached warrant be issued authorizing the search of the SUBJECT PREMISES and the SUBJECT PERSON and the seizure of the items listed in Attachment C.

Respectfully submitted,

/S/ Justin S. Terry
Special Agent
Federal Bureau of Investigation


Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this written affidavit.

10/19/2020

Joi Elizabeth Peake
United States Magistrate Judge
Middle District of North Carolina

**Attachment A**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

The entire premises located at 4522 Piedmont Trace Drive, High Point, North Carolina 27409 (the SUBJECT PREMISES), to include, a black Dodge Challenger bearing a North Carolina license plate HEL-7881 and a dark grey or black Lexus bearing North Carolina license plate FDD-4608, if either vehicle is located on the curtilage of the SUBJECT PRESMISES at the time of execution. The SUBJECT PREMISES is a townhouse-style residence located in a brick front building with a red front door, white trim, and a single-car garage with a white garage door. The letters "4522" are prominently displayed on a beige address plate on the right side of the front door. The property is listed in Guilford County GIS records with the Parcel ID of 212945.

2



3



4

## Attachment B

LANDIS LAMAR JACKSON



Landis Lamar Jackson, depicted above

DOB 6/25/1984

5

## Attachment C

## ITEMS TO BE SEIZED

The following materials, which constitute fruits of crime, namely violations of Title 21 U.S.C § 848; Title 21 U.S.C § 848(e)(1)(a); and Title 21 U.S.C. § 846, 841(b)(1)(A) and 841(b)(1)(D):

1. United States currency.

2. Jewelry.

3. Wristwatches.

4. Precious metals, and items made from precious metals.